**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| Cincinnati Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No._____ |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| Crossmann Communities of North | ) | (Declaratory Judgment) |
| Carolina, Inc.; Crossmann | ) | (Non-Jury Trial Demanded) |
| Communities, Inc.; Beazer Homes | ) | |
| Investment Corporation; and | ) | |
| Fairways at River Oaks | ) | |
| Homeowners' Association, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The Plaintiff, Cincinnati Insurance Company ("Cincinnati"), seeking a declaration

of rights pursuant to 28 U.S.C. § 2201(a) as set forth herein, alleges:

## PARTIES

1. Plaintiff Cincinnati is an Ohio corporation with its principal place of business in

   Fairfield, Ohio.  At all times material hereto, Cincinnati was in the business of

   selling contracts of insurance to commercial entities.

2. Upon information and belief, Defendant Crossmann Communities of North

   Carolina, Inc. ("Crossmann") was a North Carolina corporation with its principal

   place of business in Myrtle Beach, South Carolina, and is subject to the

   jurisdiction of this court.  Crossmann was in the business of residential real estate

   development and construction.

3. Upon information and belief, Defendant Crossman Communities, Inc. ("CCI") is

   an Indiana corporation with its principal place of business in Indianapolis,

Indiana, and is subject to the jurisdiction of this court.  CCI is in the business of residential real estate development and construction.

4. Upon information and belief, Beazer Homes Investment Corporation ("Beazer") is a Delaware corporation with its principal place of business in Atlanta, Georgia, and is subject to the jurisdiction of this court.  Beazer is in the business of residential real estate development and construction.

5. Upon information and belief, Fairways at River Oaks Homeowners' Association (the "HOA") is a South Carolina non-profit corporation with its principal place of business in Myrtle Beach, South Carolina, and is subject to the jurisdiction of this court.  The HOA is named as a party since it may have some interest in the outcome.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a) and (c) because this is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue lies in this district under 28 U.S.C. § 1391(a).

## BACKGROUND

8. This matter involves a request for a declaration of rights to determine whether coverage exists pursuant to three excess liability policies Cincinnati sold to Crossman Communities, Inc. (CCI).  Policy No. CCC 4382766 was in effect from July 1, 1995 to July 1, 1998; Policy No. CCC 4445840 was in effect from July 1, 1998 to July 1, 2001; and Policy No. CCC 4445840 was in effect from July 1,

2001 to July 1, 2002 (the "Cincinnati Policies"). The Cincinnati Policies are attached hereto as Exhibit A and incorporated herein.

9. Upon information and belief, Crossmann was incorporated on or about May 11, 1998, as a wholly owned subsidiary of CCI.

10. River Oaks Golf Development Corporation ("River Oaks") was incorporated on or about June 25, 1993, and merged into Crossmann in May 1998.

11. Pinehurst Builders, Inc. ("Pinehurst") was incorporated on or about December 31, 1979, and merged into Crossmann in May 1998.

12. CCI and Crossmann merged into Beazer on or about April 17, 2002.

13. Beazer is a wholly-owned subsidiary of Beazer Homes USA, Inc.

14. Harleysville Mutual Insurance Company ("Harleysville") sold a CGL policy, Policy No. CB9A5801, to Pinehurst that was in effect from January 29, 1993 through August 29, 1998.

15. On or about June 26, 1998, the name of the insured on Harleysville Policy No. CB9A5801 was changed to Crossmann Communities of North Carolina, Inc. d/b/a Pinehurst Builders.

16. Harleysville sold a comprehensive general liability policy, Policy No. GL705673, to River Oaks that was in effect from July 1993 through October 4, 1998.

17. Pinehurst was named as an additional insured under Harleysville Policy No. GL705673.

18. Harleysville sold an excess coverage policy, Policy No. BEC9A5801, to Pinehurst that was in effect from July 29, 1993 through August 29, 1998. Harleysville Policy No. BEC9A5801 was issued to Pinehurst, Crossmann, and River Oaks.

19. On or about June 26, 1998, the named insured on Harleysville Policy No. BEC9A5801 was changed from Pinehurst to Crossmann Communities of North Carolina d/b/a Pinehurst Builders.

20. On September 8, 1994, River Oaks was added to Harleysville Policy No. BEC9A5801 as an additional insured.

21. The Insuring Agreements in the CGL policies issued by Harleysville state in part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" [or] "property damage" . . . to which this insurance applies. . . . We will have the right and duty to defend any "suit" seeking those damages.

(Harleysville CGL Policies § II.A.1., "Business Liability.")

22. The Harleysville CGL policies provide that Harleysville has the duty to defend the insured against any suit seeking damages for "property damage" caused by an "occurrence."  (Harleysville CGL Policies § II.A.1.a. and b., "Business Liability.")  An "occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Harleysville CGL Policies § II.F.9, "Liability and Medical Expenses Definitions.")

23. The Harleysville CGL policies define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property," and includes "[l]oss of use of tangible property that is not physically injured." (Harleysville CGL Policies § II.F.12, "Liability and Medical Expenses Definitions.")

24. From July 1, 1993 through August 29, 1998, CCI was insured by CGL policies issued by Indiana Insurance Company ("Indiana").  From July 1, 1997 through

August 29, 1998, CCI was insured by Indiana CGL policies (the "Indiana

Policies") numbered 42-168-444 and 42-178-801.

25. The Indiana Policies cover any and all of CCI's subsidiaries, financially

controlled organizations, and joint ventures.

26. The Insuring Agreements in the Indiana Policies provide, in part,

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.

(Indiana Policies § I.A.1.a, "Bodily Injury and Property Damage Liability.")

27. The Indiana Policies provide that Indiana has the duty to defend the insured

against any suit seeking damages for "bodily injury" or "property damage" caused

by an "occurrence."  (Indiana Policies, § I.A.1.a. and b., "Bodily Injury and

Property Damage Liability.")  An "occurrence" is defined as an "accident,

including continuous or repeated exposure to substantially the same general

harmful conditions." (Indiana Policies, § V.12, "Definitions.")

28. The Indiana Policies define "property damage" as "[p]hysical injury to tangible

property, including all resulting loss of use of that property," and includes "[l]oss

of use of tangible property that is not physically injured."  (Indiana Policies, §

V.15.a. and b., "Definitions.")

29. Massachusetts Bay Insurance Company ("Massachusetts Bay") sold a general

liability policy, Massachusetts Bay Policy No. ZDI 5260801 (the "Massachusetts

Bay Policy"), to CCI that was in effect from August 29, 1998 through August 29,

2000.

30. The Massachusetts Bay Policy covers any and all of CCI's subsidiaries, financially controlled organizations, and joint ventures.

31. The Insuring Agreement in the Massachusetts Bay Policy provides in part,

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.

(Massachusetts Bay Policy § I.A.1.a., "Bodily Injury and Property Damage Liability.")

32. The Massachusetts Bay Policy provides that Massachusetts Bay has the duty to defend the insured against any suit seeking damages for "bodily injury" or "property damage" caused by an "occurrence."  (Massachusetts Bay Policy §§ I.A.1.a. and b., "Bodily Injury and Property Damage Liability.")  An "occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Massachusetts Bay Policy § V.12, "Definitions.")

33. The Massachusetts Bay Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property," and includes "[l]oss of use of tangible property that is not physically injured." (Massachusetts Bay Policy § V.15.a. and b., "Definitions.").

34. Regent Insurance Company ("Regent") sold a comprehensive insurance policy, Regent Policy No. CCI 0320615 (the "Regent Policy"), to CCI that was in effect from January 1, 2001, to January 1, 2002.

35. The Regent Policy covers any and all of CCI's subsidiaries, financially controlled organizations, and joint ventures.

36. The Insuring Agreement in the Regent Policy provides in part,

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.

(Regent Policy § 1.1, "Bodily Injury and Property Damage Liability.")

37. The Regent Policy states that it applies to "bodily injury" and "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence." (Regent Policy, § 1.1.b., "Bodily Injury and Property Damage Liability.")  An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Regent Policy, § V.13, "Definitions.")

38. The Regent Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured."  (Regent Policy, § V.17, "Definitions.")

39. The Cincinnati Policies are "follow form" excess policies.

40. The Cincinnati Policies cover all of CCI's subsidiaries, financially controlled organizations, and joint ventures.

41. Pertinent provisions of the 1995 Policy issued to CCI by Cincinnati are as follows:

**PART I – DEFINED WORDS AND PHRASES**

\*    \*    \*

**E.**    **"completed operations hazard"** includes **personal injury** and **property damage** arising out of the operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the **personal injury** or **property damage** occurs after

such operations have been completed or abandoned and occurs away from premises owned by or rented to the **Insured**. Operations include materials, parts or equipment furnished in connection therewith.  Operations shall be deemed completed at the earliest of the following times:

**(1)**    when all operations to be performed by or on behalf of the **Insured** under the contract have been completed,

**(2)**    when all operations to be performed by or on behalf of the **Insured** at the site of the operations have been completed, or

**(3)**    when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The **completed operations hazard** does not include **personal injury** or **property damage** arising out of

**(1)**    operations in connection with the transportation of property, unless the **personal injury** or **property damage** arises out of a condition in or on a vehicle created by the loading or unloading thereof.

**(2)**    the existence of tools, uninstalled equipment or abandoned or unused materials;

**F.**    **"Insured's products"** means goods or products manufactured, sold, handled or distributed by the **insured** or by others trading under his name, including any container thereof (other than a vehicle), but **Insured's products** shall not include a vending machine or any property other than such container, rented to or located for use of others, but not sold;

**G.**    **"occurrence"** means an accident, or a happening or event, or a continuous or repeated exposure to conditions which occurs during the policy period which unexpectedly or unintentionally results in **personal injury, property damage** or **advertising liability**.  All such exposure to substantially the same general conditions existing

at or emanating from one premises location shall be deemed one **occurrence;**

\* \* \*

**I.**     **"products hazard"** includes **personal injury** and **property damage** arising out of the **Insured's products** or reliance upon a representation or warranty made at any time with respect thereto, but only if the **personal injury** or **property damage** occurs away from premises owned by or rented to the **Insured** and after physical possession of such products has been relinquished to others;

**J.**     **"property damage"** means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

**K.**     **"ultimate net loss"** means the sum actually expended or payable in cash to procure settlement or satisfaction of the **Insured's** legal obligation for damages either by (1) final adjudication or (2) compromise with the written consent of the **Company**; however, **ultimate net loss** shall not include salaries of the **Insured's** employees or expense incurred by the **Insured** or the **Company** in investigation, adjustment or litigation;

**L.**     **"underlying insurance"** means the policies listed in the schedule of underlying policies and the insurance available to the **Insured** under all other insurance policies applicable to the **occurrence;**

**M.**     **"underlying limit"** means the total applicable limits of all **underlying insurance** less the amount, if any, by which the applicable aggregate limit of the applicable policy listed in the schedule of underlying policies has been reduced solely by payment of loss for **occurrence** during the period of this policy. The limits of liability of a policy listed in the schedule of underlying policies shall be deemed applicable regardless of any defense which the insurer who provides the policy may assert because of the **insured's** failure to comply with any condition of the policy or the inability of the insurer to pay by reason of bankruptcy or insolvency.

\* \* \*

**PART II – THE COVERAGE**

**A.    WE** WILL PAY

**We** will pay on behalf of the **Insured** the **ultimate net loss** for **occurrences** during the policy period in excess of the **underlying insurance** or for **occurrences** covered by this policy which are either excluded or not covered by **underlying insurance** because of **Personal Injury, Property Damage,** or **Advertising Liability** anywhere in the world.

**B.    THIS POLICY DOES NOT APPLY –EXCLUSIONS**

*    *    *

(e)    to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the **Insured's products** or work completed by or for the **Insured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

*    *    *

(g)    to **personal injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

*    *    *

(n)    to **Personal Injury** or **Property Damage** for liability assumed under any contract;

(o)    to **Property Damage** to:

*    *    *

(3)    work performed by or on behalf of the **Insured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

*    *    *

C.    **OUR** DUTIES AND **YOURS** IN CLAIMS OR SUITS –
DEFENSE, INVESTIGATION, SETTLEMENT,
REIMBURSEMENT, ASSISTANCE AND COOPERATION

**(a)**    With respect to such insurance as is afforded by this policy,
if there is no underlying insurer obligated to do so, **we** shall
have the right and duty to defend any suit against the
**Insured** seeking damages on account of **personal injury,
property damage** or **advertising liability**, even if any of
the allegations of the suit are groundless, false, or
fraudulent and . . . **we** shall not be obligated to defend any
suit after the applicable limit of **our** liability has been
exhausted.

\*    \*    \*

## PART III – CONDITIONS

This policy is subject to the following conditions:

\*    \*    \*

3.    The **Insured's** Duties in the Event of **Occurrence**, Claim or Suit

In the event of an **occurrence**, written notice containing particulars
sufficient to identify the **Insured** and also reasonably obtainable
information with respect to the time, place and circumstances
thereof, and the names and addresses of the injured and of
available witnesses, shall be given by or for the **Insured** to **us** or
any of **our** authorized agents as soon as practicable.

If claim is made or suit is brought against the **Insured**, **you** shall
immediately forward to **us** every demand, notice, summons or
other process received by **you** or **your** representative.

The **Insured** shall cooperate with **us** and, upon **our** request, assist
in making settlements, in the conduct of suits and in enforcing any
right of contribution or indemnity against any person or
organization who may be liable to the **Insured** because of
**personal injury, property damage** or **advertising liability** with
respect to which insurance is afforded under this policy; and the
**Insured** shall attend hearings and trials and assist in securing and
giving evidence and obtaining the attendance of witnesses.  The
**Insured** shall not, except at its own cost, voluntarily make any
payment, assume any obligation or incur any expense.

4.    Other Insurance

The insurance afforded under this policy shall apply as excess insurance, not contributory, to other collectible insurance (other than insurance applying as excess to **our** limit of liability hereunder) available to the **Insured** and covering loss against which insurance is afforded hereunder.

**5.**     Maintenance of Underlying Insurance

While this policy is in effect, the **Insured** shall maintain in force the **underlying insurance** listed in the Declarations as collectible insurance.  In the event the **Insured** fails or neglects to maintain such **underlying insurance** as required, this policy shall be construed as though such **underlying insurance** was in force and collectible at the time of the **occurrence.**

*     *     *

**9.**     Legal Action Against **Us** and Payment of **Ultimate Net Loss**

*     *     *

For any **occurrence** to which this policy applies, **we** shall be liable for payment of the **ultimate net loss**, (1) for **occurrences** not covered by **underlying insurance**, or (2) in excess of the **underlying limit** applicable to the **occurrence** only after the insurers who provide the applicable **underlying insurance** have paid or become obligated to pay the amount of the **underlying limit** applicable to the **occurrence. Our** payment under either (1) or (2) will be made following final determination of the amount of the **insured's** obligation to pay either by final judgment against the **insured** after actual trial or by written agreement **we** have entered into with the **insured**, the aforesaid insurers and the claimant.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance provided by this policy.

*     *     *

### ABSOLUTE POLLUTANT EXCLUSION

This endorsement modifies insurance provided under this policy.

It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:

**(g)**    **(1)**    To **personal injury** or **property damage** caused by pollutants.

**(2)**    To any loss, cost or expense arising out of any:

   **a.**    Request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of pollutants; or

   **b.**    Claim or suit by or on behalf of a government authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

**(3)**    As used in this exclusion, pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.  Pollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment.

*    *    *

This exclusion, **(g)**, applies to every injury to person or property caused directly or indirectly by pollutants regardless of whether;

**(1)**    The **insured** is regularly or otherwise engaged in activities which taint or degrade the environment; or

**(2)**    The **insured** uses, generates or produces the pollutant.

*    *    *

### PRODUCTS-COMPLETED OPERATIONS HAZARD AMENDATORY ENDORSMENT

Except insofar as coverage is available to the **Insured** in the **underlying insurance** as set forth in Schedule A of the policy, and then only for such hazard for which coverage is afforded under said **underlying insurance**, this policy shall not apply to **Personal Injury** Liability or **Property Damage** Liability arising out of **Products Hazard** or **Completed Operations Hazard** as defined herein.

All other terms and conditions of this policy remain unchanged.

42. Pertinent provisions of the 1998 and 2001 Policies issued to CCI by Cincinnati are as follows:

**SECTION I – COVERAGES**

**A.    Insuring Agreement**

We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages in excess of the "underlying insurance" or for an "occurrence" covered by this policy which is either excluded or not covered by "underlying insurance" because of:

**1.**    "Bodily injury" or "property damage" covered by this policy occurring during the policy period and caused by an "occurrence"; or

\*    \*    \*

The amount we will pay is limited as described in Limits of Insurance (Section **III**).

No other obligation or liability to pay sums or perform acts or services is covered unless provided for under Defense and Supplementary Payments.

**B.    Exclusions**

\*    \*    \*

**3.    Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**a.**    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**b.**    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of a sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

* * *

**6.    Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

* * *

**13.    Pollutant**

* * *

**b.**    Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

**(1)**    At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

**(2)**    At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(3)**    Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(4)**    At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

**(a)** If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

**(b)** If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

\*   \*   \*

**c.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

**(2)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

**d.** Any liability cause by pollutants excluded by "underlying insurance".

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment.

Exclusion **13.** applies to every injury to person or property caused directly or indirectly by pollutants regardless of whether:

**a.** The insured is regularly or otherwise engaged in activities that taint or degrade the environment; or

      **b.**     The insured uses, generates or produces the pollutant.

**14.**    **Recall of Products, Work or Impaired Property**

Any liability or damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**a.**     "Your product";

**b.**     "Your work"; or

**c.**     "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\*   \*   \*

**C.**    **Defense and Supplementary Payments**

**1.**    We have the right and duty to defend any claim or "suit" against the insured for damages covered by this policy, even if the allegations are groundless, false, or fraudulent, when:

**a.**     The applicable limits of the "underlying insurance" and any other insurance have been exhausted payment of claims; or

**b.**     Damages are sought for "bodily injury", "property damage", "personal injury", or "advertising injury" which are not covered by "underlying insurance" or other insurance.

\*   \*   \*

**3.**    We have no duty to investigate, settle or defend any claim or "suit" other than those circumstances described in Paragraph **C.1.**  However, we do have the right to participate in the investigation, settlement or defense of any claim or "suit" for which coverage may be afforded by this policy.  If we exercise this right, we will do so at our expense.

\*    \*    \*

## SECTION III – LIMITS OF INSURANCE

\*    \*    \*

**3.**     Subject to limits described in **2.** above the Each Occurrence Limit is the most we will pay for the "ultimate net loss":

    **a.**     In excess of the applicable limits of "underlying insurance"; or

    **b.**     If an "occurrence" is not covered by "underlying insurance", but covered by the terms and conditions of this policy.

because of all "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any one "occurrence".

**4.**     Subject to limits described in **2.** and **3.** above and to the terms and conditions of the "underlying insurance":

    **a.**     If the limits of "underlying insurance" have been reduced by payment of claims, this policy will continue in force as excess of the reduced "underlying insurance"; or

    **b.**     If the limits of "underlying insurance" have been exhausted by payment of claims, this policy will continue in force as "underlying insurance."

\*    \*    \*

## SECTION IV – CONDITIONS

\*    \*    \*

**6.**     **Duties In The Event of Occurrence, Claim or Suit**

    **a.**     You must see to it that we are notified as soon as practicable of an "occurrence" which may result in a claim or "suit".  To the extent possible, notice should include:

        **(1)**     How, when and where the "occurrence" took place;

        **(2)**     The names and addresses of any injured persons and witnesses; and

        **(3)**     The nature and location of any injury or damage arising out of the "occurrence".

\*    \*    \*

**b.**    If a claim is made or "suit" is brought against any insured that is likely to involve this policy, you must:

    **(1)**    Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)**    Notify us as soon as practicable.

\*    \*    \*

**c.**    You and any other involved insured must:

    **(1)**    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit".

    **(2)**    Authorize us to obtain records or other information;

    **(3)**    Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

    **(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.**    No insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

\*    \*    \*

**10.    Maintenance of Underlying Insurance**

While this policy is in effect, the insured shall maintain in force the "underlying insurance" listed in the Schedule of Underlying Policies as collectible insurance.  The terms, conditions and endorsements of "underlying insurance" will not materially change and renewals or replacements of "underlying insurance" will not be more restrictive in coverage.  Limits of "underlying insurance" will not be reduced except for any reduction or exhaustion in the aggregate limits of insurance due to payment of claims.  In the event you fail or neglect to maintain "underlying insurance" as required, this policy will apply as though such "underlying insurance" was in force and collectible at the time of the "occurrence".

The limits of "underlying insurance" shall be deemed applicable regardless of any defense which the insurer who provides the "underlying insurance" may assert because of the insured's failure to comply with any Condition of the policy or the inability of the insurers to pay by reason of bankruptcy or insolvency.

**11.    Other Insurance**

The insurance provided by this policy is excess over any other valid and collectible insurance, other than insurance written specifically to be excess over this insurance, and shall not be contributory.

\*    \*    \*

## SECTION V – DEFINITIONS

\*    \*    \*

**3.**    "Bodily injury" means bodily harm or injury, sickness, disease, disability, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time.

\*    \*    \*

**6.**    "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.**    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.**    You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.**    The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.**    Your fulfilling the terms of the contract or agreement.

\*    \*    \*

**9.**    "Occurrence" means:

a.    An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage".

All damages arising from continuous or repeated exposure to substantially the same general conditions shall be deemed one "occurrence".

\*   \*   \*

**11.**    "Products-completed operations hazard" means:

a.    All "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)**    Products that are still in your physical possession; or

**(2)**    Work that has not yet been completed or abandoned.

b.    "Your work" will be deemed completed at the earliest of the following times:

**(1)**    When all of the work called for in your contract has been completed.

**(2)**    When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

**(3)**    When that part of the work done at the job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

c.    This hazard does not include "bodily injury" or "property damage" arising out of:

**(1)**    The transportation of the property, unless the injury or damage arises out of a condition in or on a vehicle created by the loading or unloading of it; or

(2)    The existence of tools, uninstalled equipment or abandoned or unused materials.

12.    "Property damage" means:

a.    Physical injury to or destruction of tangible property including all resulting loss of use.  All such loss of use shall be deemed to occur at the time of the physical injury or destruction that caused it; or

b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

15.    "Ultimate net loss" means the sum actually paid or payable in the settlement or satisfaction of the insured's legal obligation for damages, covered by this insurance, either by adjudication or compromise.  "Ultimate net loss" does not include Defense and Supplementary Payments as described in SECTION **I.C.** of this policy.

16.    "Underlying insurance" means the policies of insurance listed in the Schedule of Underlying Policies and the insurance available to the insured under all other insurance policies applicable to the "occurrence". "Underlying insurance" also includes any type of self-insurance or alternative method by which the insured arranges for funding of legal liabilities that affords coverage that this policy covers.

17.    "Underlying limit" means the total of the applicable limits of all "underlying insurance" less the amount, if any, by which the applicable limit of the applicable policy listed in the Schedule of Underlying Policies has been reduced solely by payment of loss for an "occurrence" during the policy period.

18.    "Your product" means:

a.    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1)    You;

(2)    Others trading under your name; or

(3)    A person or organization whose business or assets you have acquired; and

      **b.**      Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

      **a.**      Warranties or representations made at any time with respect to the fitness, quality durability, performance or use of your product; and

      **b.**      The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**19.**      "Your work" means:

      **a.**      Work or operations performed by you on your behalf; and

      **b.**      Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

      **a.**      Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your work; and

      **b.**      The providing of or failure to provide warnings or instructions.

*     *     *

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

**CONTRACTORS LIMITATIONS (US 324 (11/96))**

This Endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY POLICY**
**PROFESSIONAL UMBRELLA LIABILTY POLICY**
**PROFESSIONAL UMBRELLA LIABILITY POLICY – CLAIMS MADE**

**Exclusions (Section I.B.)** is modified to add the following:

**1.**      This policy does not apply to:

\*     \*     \*

**b.**     **(1)**     Any liability arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

         **(a)**     Providing engineering, architectural or surveying services to others; and

         **(b)**     Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

    **(2)**     Subject to Paragraph **(3)** below, professional services include:

         **(a)**     The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

         **(b)**     Supervisory or inspection activities performed as part of any related architectural or engineering activities.

    **(3)**     To the extent coverage is provided by valid and collectible "underlying insurance" as listed in the Schedule of Underlying Policies, and then only for such hazards for which coverage is afforded by such "underlying insurance", professional services shall not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with construction work you perform.

\*     \*     \*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

**PRODUCTS-COMPLETED OPERATIONS HAZARD LIMITATION**

**(US 406 (01/96))**

*This Endorsement is only appended to the 1998 Policy and part of the 2001 Policy*

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY POLICY**
**PROFESSIONAL UMBRELLA LIABILTY POLICY**
**PROFESSIONAL UMBRELLA LIABILITY POLICY – CLAIMS MADE**

Exclusions (Section I.B.) is modified to add the following:

This policy does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" unless such coverage is provided by valid and collectible "underlying insurance" as listed in the Schedule of Underlying Policies, and then only for such hazards for which coverage is afforded by such "underlying insurance."

\*    \*    \*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT
CAREFULLY**

**FUNGUS EXCLUSION (IA 459A (11/87))**

*This Endorsement is appended to part of the 2001 Policy*

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY POLICY**

**COMMERCIAL UMBRELLA LIABILITY POLICY, US101,** is amended as follows:

**1.     SECTION I – COVERAGES, B. Exclusions** is amended to add the following:

    **16.     Fungus**

        **a.**     Any liability arising out of, resulting from, caused by, contributed to, or in any way related to any "fungus";

        **b.**     Any costs or expenses associated, in any way, with the abatement, mitigation, remediation, containment, detoxification, neutralization, monitoring, removal, disposal or any obligations to investigate or assess the presence or effects of any "fungus";

        **c.**     Any supervision, instruction, recommendation, warning or advice given or which should have been given in connection with Paragraphs **16.a.** or **16.b.** of this endorsement;

**d.** Any obligation to share with or repay any person, organization or entity, related in any way to Paragraphs **16.a.**, **16.b.** or **16.c.** of this endorsement; or

**e.** Any liability caused by "fungus" excluded by "underlying insurance."

\*   \*   \*

**II.** **SECTION V – DEFINITIONS** is amended to add the following:

**20.** "Fungus" includes, but is not limited to, any form or type of mold, mushroom or mildew, and any mycotoxins, spores, allergens, scents or byproducts produced or released by fungus.

\*   \*   \*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

## ABSOLUTE POLLUTANT EXCLUSION

This endorsement modifies insurance provided under the following:

> **COMMERCIAL UMBRELLA LIABILITY POLICY**
> **PROFESSIONAL UMBRELLA LIABILITY POLICY**
> **PROFESSIONAL UMBRELLA LIABILITY POLICY – CLAIMS MADE**

Exclusions (SECTION I.B.) is modified to add the following exclusion:

It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:

This policy does not apply to:

**13.** **(1)** Any liability caused by pollutants.

**(2)** To any loss, cost or expense arising out of any:

**a.** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of pollutants; or

**b.** Claim or suit by or on behalf of a governmental authority for damages because of testing for,

monitoring, cleaning up, removing, containing,
treating, detoxifying or neutralizing, or in any way
responding to, or assessing the effects of pollutants.

\*     \*     \*

As used in this exclusion, pollutants means any solid, liquid, gaseous or
thermal irritant or contaminant, including but not limited to smoke, vapor,
soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials
to be recycled, reconditioned or reclaimed.  Pollutants include but are not
limited to substances which are generally recognized in industry or
government to be harmful or toxic to persons, property or the
environment.

Exclusion **13.** applies to every injury to person or property caused directly
or indirectly by pollutants regardless of whether:

**(1)**     The insured is regularly or otherwise engaged in activities which
taint or degrade the environment; or

**(2)**     The insured uses, generates or produces the pollutant

43. The following is a chart of the known applicable insurance policies:

| **Date** | **Primary Carrier** | **Excess Carrier** |
|---|---|---|
| July 1993 – June 1994 | Harleysville | |
| July 1994 – June 1995 | Harleysville | Harleysville |
| July 1995 – June 1997 | Harleysville | Harleysville & Cincinnati |
| July 1997 – August 1998 | Harleysville & Indiana | Harleysville & Cincinnati |
| September 1998 – August 2000 | Massachusetts Bay | Cincinnati |
| September 2000 – January 2002 | Regent | Cincinnati |

44. The following are the known policy limits on the primary carriers' insurance

policies:

| **Primary Carrier** | **Policy Limits** |
|---|---|
| Harleysville | $12 Million |

| Indiana | $4 Million |
| Massachusetts Bay | $4 Million |
| Regent | $4 Million |

45. Upon information and belief, River Oaks and Crossmann constructed condominiums at the Fairways at River Oaks in Myrtle Beach, South Carolina.

46. Upon information and belief, when Beazer began receiving notice of alleged damages to the condominiums at the Fairways at River Oaks, Beazer established an investigation and repair protocol for each condominium and has undertaken, and in some instances completed, such repairs.

47. Beazer now seeks reimbursement from Cincinnati, under the Cincinnati Policies, for its costs associated with the aforementioned investigation and repair of the condominiums at the Fairways at River Oaks.

48. In November of 2007, Beazer Homes USA, Inc. tendered a claim under the Cincinnati Policies. The claim arises out of River Oaks' and Crossmann's construction of the condominiums at the Fairways at River Oaks.

49. The HOA formally notified (the "Notice") Beazer Homes USA, Inc. of alleged construction defects at the Fairways at River Oaks on or about October 17, 2007.

50. The Notice alleged various construction defects, including, *inter alia*, improper installation details on roof underlayment, vinyl siding, building wrap, meal and vinyl trim, brick veneer, windows, and flashing details; improper installation of composition shingles and roofing accessories; inadequate attic ventilation; and inadequate connection between the foundation and wall framing. The Notice further stated that the "construction defects" and "construction deficiencies"

"serve to reduce the structural integrity of the buildings, compromise their function, and have already caused water-related damage."

51. Upon information and belief, on or about February 25, 2008, Beazer sent notice of the alleged construction deficiencies to its vendors and subcontractors who supplied materials and/or performed work at the Fairways at River Oaks. This notice stated, *inter alia*,

> Beazer intends to fulfill its obligations to the Fairways @ River Oaks HOA and the individual unit owners to correct construction deficiencies if they are found to be the responsibility of Beazer and/or its subcontractors/vendors. Beazer expects that its subcontractors and vendors will fulfill their contractual obligations, including indemnification, to Beazer. We anticipate that you will coordinate any necessary remedial work within your scope with Beazer. All your prior and current insurers should be notified of this claim, and we are hereby asking that your agent place all known prior and current insurers on notice of this claim.

52. Pursuant to the terms of the Cincinnati Policies, CCI was required to maintain primary insurance as indicated on the Schedule of Underlying Policies. In the event CCI did not maintain this "underlying insurance," the Cincinnati Policies applied as though the "underlying insurance" was in force and collectible.

53. CCI failed to comply with the terms of the Cincinnati Policies because CCI failed to maintain all "underlying insurance" as listed on the Cincinnati Policies' Schedules of Underlying Policies.

54. Upon information and belief, some primary insurers have settled Beazer's claims against them for less than the policy limits.

55. Because the Cincinnati Policies provide only excess insurance, Cincinnati has no liability where the policy limits of the "underlying insurance" have not been exhausted by the payment of claims.

56. The Cincinnati Policies do not provide insurance coverage to CCI or any other alleged insured when the policy limits of the "underlying insurance" have not been exhausted by the payment of claims.

57.  The aforementioned terms, conditions, exclusions and other provisions of the Cincinnati Policies also preclude coverage herein.

58. There is a justiciable controversy existing between the parties, and the parties named as Defendants have or may have an interest in the subject matter of this litigation, in that the resolution of coverage matters may affect the rights and liabilities of Defendants in regard to their exposure to damages which are the subject of the Notice.

59. A dispute exists between Cincinnati and Beazer, Crossmann, River Oaks, Pinehurst, CCI, and any other alleged insured as to whether Beazer, Crossmann, River Oaks, Pinehurst, and/or CCI breached the terms and conditions of the Cincinnati Policies and whether Cincinnati is obligated to: 1) reimburse Beazer, Crossmann, River Oaks, Pinehurst, or CCI for monies Beazer, Crossmann, River Oaks, Pinehurst, or CCI has and/or will in the future expend to investigate and/or repair and remediate condominiums located at the Fairways at River Oaks, or 2) defend and/or indemnify Beazer, Crossmann, River Oaks, Pinehurst, or CCI for any pending and potential future claims asserted against Beazer, Crossmann, River Oaks, Pinehurst, or CCI that are alleged to have occurred during the period in which the Cincinnati Policies were in effect.

60. Cincinnati requests and is entitled to a declaration by this Court, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, declaring the

rights, duties, and obligations of Cincinnati and Beazer, Crossmann, River Oaks, Pinehurst, and CCI pursuant to the Cincinnati Policies, and specifically declaring that Cincinnati is not obligated to 1) reimburse Beazer, Crossmann, River Oaks, Pinehurst, or CCI for monies Beazer, Crossmann, River Oaks, Pinehurst, or CCI has and/or will in the future expend to investigate and/or repair and remediate condominiums located at the Fairways at River Oaks, or 2) provide a defense and/or indemnify Beazer, Crossmann, River Oaks, Pinehurst, or CCI for any pending and potential future claims asserted against Beazer, Crossmann, River Oaks, Pinehurst, or CCI that are alleged to have occurred during the period in which the Cincinnati Policies were in effect.

WHEREFORE, the Plaintiff, Cincinnati Insurance Company, having fully complained against the Defendants, Crossmann Communities of North Carolina, Inc.; Crossman Communities, Inc.; Beazer Homes Investment Corporation; and Fairways at River Oaks Homeowners' Association, respectfully requests this District Court to enter judgment declaring the Cincinnati is not obligated to:  1) reimburse Beazer, Crossmann, River Oaks, Pinehurst, or CCI for monies Beazer, Crossmann, River Oaks, Pinehurst, or CCI has and/or will in the future expend to investigate and/or repair and remediate condominiums located at the Fairways at River Oaks, or 2) provide a defense and/or indemnify Beazer, Crossmann, River Oaks, Pinehurst, or CCI for any pending and potential future claims asserted against Beazer, Crossmann, River Oaks, Pinehurst, or CCI that are alleged to have occurred during the period in which the Cincinnati Policies were in effect.  Plaintiff further requests its costs and expenses incurred herein including

reasonable attorneys' fees; and any such other and further relief as the Court may deem

just and proper.


Respectfully submitted,


/s/ Francis M. Mack
Francis M. Mack
S.C. Bar #3505
Federal Ct. I.D. #3261
RICHARDSON, PLOWDEN &
ROBINSON, P.A.
1900 Barnwell Street
Post Office Drawer 7788
Columbia, South Carolina  29202
(803) 771-4400

ATTORNEYS FOR PLAINTIFF,
CINCINNATI INSURANCE COMPANY

Columbia, South Carolina
Dated: May 26, 2009